```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                                       :
                                                             :    Chapter 11
M. FABRIKANT & SONS, INC. and                                :    (Jointly Administered)
FABRIKANT-LEER INTERNATIONAL, LTD.,                          :
                                                             :    Case No. 06-12737 (SMB)
                              Debtors.                       :
-------------------------------------------------------------X
ALAN M. JACOBS, as Trustee of the Shared                     :
Assets Trust,                                                :
                                                             :
                                                             :
                              Plaintiff,                     :    Adv. Pro. 08-1690 (SMB)
                                                             :
              -against-                                      :
                                                             :
GRAMERCY JEWELRY MANUFACTURING                               :
CORP.,                                                       :
                                                             :
                              Defendant.                     :
-------------------------------------------------------------X
```

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

SILVERMAN ACAMPORA LLP
Attorneys for Plaintiff
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
      Lon J. Seidman, Esq.
           Of Counsel

LOANZON SHEIKH LLC
Attorneys for Defendant
112 Madison Ave., 5th Floor
New York, New York 10016

       Tristan C. Loanzon, Esq.
           Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The plaintiff Alan M. Jacobs, as Trustee of the Shared Assets Trust, filed this adversary proceeding against Gramercy Jewelry Manufacturing Corp. ("Gramercy") under 11 U.S.C. §547(b) to recover $103,831.52 paid by the debtors M. Fabrikant & Sons, Inc. ("MFS") and Fabrikant-Leer International. Ltd. ("FLI," and collectively with MFS, the "Debtors") during the 90-day period preceding the filing of the Debtors' chapter 11 petitions. The Court conducted a bench trial, and concludes that the plaintiff is entitled to judgment in the sum of $100,797.17.

## BACKGROUND

At all relevant times, the Debtors were engaged in the business of selling diamonds and jewelry. Gramercy was engaged in the business of manufacturing fine jewelry, and also supplied jewelry and other services to one or both Debtors for fifteen years prior to the petition date. (See Trial Transcript, dated Jan. 20, 2010 ("Tr."), at 44 (ECF Doc. # 12).)[1] The payment terms under Gramercy's invoices were "net 30 days," i.e., 30 days after the invoice date. (Tr. at 25.) According to Marilyn Fulladosa, an employee in Gramercy's accounts receivable department since 2000, the Debtors generally delivered one check each month by messenger that covered one or more outstanding invoices. (See Tr. at 24.) The Debtors were historically slow payers, and Gramercy sometimes called the Debtors for payment. (Tr. at 68.) From 2000 through 2005, the Debtors paid approximately 30 days after the due date stated in the invoice.

---

[1] Unless indicated otherwise, citations to the ECF docket refer to the docket in this adversary proceeding.

(Tr. at 25.)  At some point in 2006, the Debtors started to pay 60 days after the due date.

(Tr. at 25.)

The Debtors filed their chapter 11 petitions on November 17, 2006.  During the preceding 90 days, the Debtors made the following transfers to Gramercy:

**MFS**

| Check number | Date check/wire cleared Debtors' bank account | Transfer amount ($) |
|---|---|---|
| 108029 | August 21, 2006 | 82.50 |
| 8351 | September 16, 2006 | 6,224.53 |
| 108104 | September 20, 2006 | 2,870.13 |
| **Total** | | **9,177.16** |

**FLI**

| Check number | Date check/wire cleared Debtors' bank account (2006) | Transfer amount ($) |
|---|---|---|
| 2224 | September 11, 2006 | 3,783.70 |
| 2239 | September 14, 2006 | 555.00 |
| 2242 | September 15, 2006 | 281.48 |
| 2246 | September 19, 2006 | 3,277.20 |
| 2253 | September 20, 2006 | 465.00 |
| 2260 | September 22, 2006 | 555.00 |
| 2259 | September 22, 2006 | 828.50 |
| 2261 | September 22, 2006 | 34,088.70 |
| 2274 | September 27, 2006 | $828.80 |
| 2283 | October 3, 2006 | 23,126.81 |
| 2288 | October 4, 2006 | 16,233.17 |
| 1002 | October 19, 2006 | 3,490.00 |
| 1319 | October 4, 2006 | 130.00 |
| 1075 | November 7, 2006 | 7,011.00 |
| **Total** | | **94,654.36** |

(See Joint Pre-Trial Order, dated Nov. 5, 2009 ("Joint Pre-Trial Order"), at ¶ 5(a) (ECF Doc. # 11).)

3

The Debtors confirmed a joint plan, (Order Confirming Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated May 12, 2008 (Case No. 06-12737, ECF Doc. # 652)), that resulted in their de facto substantive consolidation. Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.), Adv. Proc. No. 07-2780, 2009 WL 3806683, at *10 (Bankr. S.D.N.Y. Nov. 10, 2009). With certain exceptions, the plan vested the plaintiff with the authority to pursue avoidance claims, and he commenced this adversary proceeding pursuant to 11 U.S.C. §§ 547(b) and 550 to avoid the transfers to Gramercy and recover their value. At trial, Gramercy stipulated or conceded that the plaintiff had established his prima facie case under 11 U.S.C. § 547(b), the plaintiff acknowledged that Gramercy established a "new value" defense, 11 U.S.C. § 547(c)(4), in the amount of $2,187, and the Court dismissed Gramercy's contemporaneous exchange for value defense under 11 U.S.C. § 547(c)(1). The only remaining issue is whether the transfers were incurred and made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

## DISCUSSION

**A.    Introduction**

Section 547(c)(2) of the Bankruptcy Code states:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—

> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms.

Section 547(c)(2) "is intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 547.04[2], at 547-51 (16th ed. 2010) ("COLLIER"); accord Kleven v. Household Bank F.S.B., 334 F.3d 638, 642 (7th Cir.), cert. denied, 540 U.S. 1073 (2003); Waldschmidt v. Ranier (In re Fulgham Constr. Corp.), 872 F.2d 739, 743 (6th Cir. 1989); Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.), 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007). "[T]he purpose of [section 547(c)(2)] is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R. Rep. No. 95-595, at 373 (1977); S. Rep. No. 95-989, at 88 (1977); accord Official Comm. of Unsecured Creditors of Cyberrebate.com, Inc. v. Gold Force Int'l, Ltd. (In re Cyberrebate.com, Inc.), 296 B.R. 639, 642 (Bankr. E.D.N.Y. 2003), aff'd, No. 03 CV 5982 (JG), 2004 WL 287144 (E.D.N.Y. Feb. 10, 2004).

The defendant bears the burden of proving its affirmative defense by a preponderance of the evidence. Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 39 (2d Cir. 1996); see 11 U.S.C. § 547(g). Prior to the 2005 amendments contained in the Bankruptcy Abuse Prevention and Consumer Protection Act, the defendant had to prove both that the transfers were made in the ordinary course of the parties' business or financial affairs under § 547(c)(2)(A) and that they were made in accordance with ordinary business terms under § 547(c)(2)(B). The 2005 amendments, which apply to this adversary proceeding, made the test disjunctive, and a defendant may

5

prevail by proving either test. Nevertheless, the words of the subparagraphs have not changed, and the pre-2005 cases interpreting their requirements remain good law. 5 COLLIER ¶ 547.04[2], at 547-51.

It is undisputed that the antecedent debts at issue were incurred in the ordinary course of the Debtors' and Gramercy's business. They related to the purchase and sale of jewelry. Furthermore, Gramercy did not supply evidence of "ordinary business terms," a phrase that refers to the range of practices in the relevant industry. 5 COLLIER ¶ 547.04[2][iii][A], at 547-57. Accordingly, to prevail, Gramercy was required to prove by a preponderance of the evidence that the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee."

In assessing this prong, the court must make a factual inquiry into the prior dealings between the parties. McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.), 210 B.R. 27, 34 (N.D.N.Y. 1997), aff'd 142 F.3d 571 (2d Cir. 1998). "[T]he cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor." WJM, Inc. v. Mass. Dep't of Pub. Welfare, 840 F.2d 996, 1011 (1st Cir. 1988) (quoting In re Magic Circle Energy Corp., 64 B.R. 269, 273 (Bankr. W.D. Okla. 1986)); accord McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.), 185 B.R. 103, 111 (Bankr. E.D.N.Y. 1995); Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.), 182 B.R. 728, 736 (Bankr. W.D. Va. 1995). The creditor must establish a "baseline of dealings" to enable the court to compare the payment practices during the preference period with the prior course of dealing. Ellenberg v. Tulip Prod. Polymerics, Inc. (In re

T. B. Home Sewing Enters., Inc.), 173 B.R. 782, 788 (Bankr. N.D. Ga. 1993). The relevant comparisons relate to the amount of the payments, the timeliness of the payments, the existence of any unusual debt collection practices and the form of, and the circumstances surrounding, the payments. In re Vogel Van & Storage, Inc., 210 B.R. at 35; Savage & Assocs. v. Mandl (In re Teligent, Inc.), 380 B.R. 324, 340 (Bankr. S.D.N.Y. 2008); Cyberrebate.com, Inc., 296 B.R. at 642; Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999); Hassett v. Goetzmann (In re CIS Corp.), 195 B.R. 251, 258 (Bankr. S.D.N.Y. 1996); see 5 COLLIER ¶ 504.04[2][ii], at 547-55. The starting point—and often the ending point—involves consideration of the average time of payment after the issuance of the invoice during the pre-preference and post-preference periods, the so-called "average lateness" computation theory.[2] See CIS II, 214 B.R. at 120–21.

While late payments are presumptively nonordinary, see Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.), 957 F.2d 239, 244 (6th Cir. 1992), the presumption can be rebutted. "A payment that is made beyond invoice or contract terms may still be considered in the ordinary course for purposes of subparagraph (B) if late payments were

---

[2]    Gramercy urged a different approach. It maintained that the appropriate test was whether the Debtors were paying all of their invoices within the same range of time during the approximate one year prior to the beginning of the preference period (August 18, 2005 to August 18, 2006) (the "Pre-Preference Period"), and the preference period itself (August 19, 2006 to November 17, 2006) (the "Preference Period"), and concluded that the virtually all invoices were paid within 150 days during both periods. (See [Defendant's] Statement of Material Facts and Conclusions of Law, dated Feb. 18, 2010, at ¶ 20) (ECF Doc. # 13).) In Hassett v. Altai, Inc. (In re CIS Corp.), 214 B.R. 108, 120 (Bankr. S.D.N.Y. 1997) ("CIS II"), the court rejected a similar approach, noting that aberrant, unusual payments lying well outside the average would skew (i.e., expand) the range, while the "average lateness" computation theory would weed them out. 214 B.R. at 120–21. The CIS II court also observed that the defendant had not cited any case law in support of its "range of payment" theory, id. at 121, and the same criticism applies to Gramercy.

Pg 8 of 18

the standard course of dealing between the parties." 5 COLLIER ¶ 504.04[2][ii], at 547-55; In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir. 1993) ("[A] 'late' payment really isn't late if the parties have established a practice that deviates from the strict terms of their written contract.") "To determine whether a late payment may still be considered ordinary between the parties, a court will normally compare the degree of lateness of each of the alleged preferences with the pattern of payments before the preference period to see if the alleged preferences fall within that pattern." 5 COLLIER ¶ 504.04[2][ii], at 547-55; see CIS II, 214 B.R. at 120 (comparing the average number of days between the invoice and payment dates during the pre-preference and preference periods).

**B.    MFS**

The Debtors and Gramercy did business with each other for fifteen years, but the only detailed evidence regarding their pre-petition dealings captured the Pre-Preference and Preference Periods. During the Pre-Preference Period, MFS delivered ten checks to Gramercy aggregating $30,126.85. (Plaintiff's Trial Exhibit ("PX") 39A.)[3] On average, MFS paid roughly 65 days after the invoice date, and the median time of payment was 59 days.[4] (See id.) During the Preference Period, MFS delivered three checks in payment of

---

[3]    The checks were dated September 15, 2005, October 6, 2005, October 28, 2005, November 28, 2005, January 3, 2006, February 8, 2006, March 31, 2006, June 27, 2006, July 24, 2006 and August 3, 2006. (PX 39A.)

[4]    The arithmetic mean is derived by adding up the values for each case and dividing the total by the number of cases. W. PAUL VOGT, DICTIONARY OF STATISTICS & METHODOLOGY: A NONTECHNICAL GUIDE FOR THE SOCIAL SCIENCES 189 (3rd ed. 2005). Here, this involves adding up the number of days between the date each invoice was issued and paid, and dividing the total by the number of payments. The "median" is the middle score in a set of ranked values; the score that divides a distribution into two equal halves. Id. at 190. A third statistical measurement, the "mode," refers to the most common score in a set of scores. Id. at 194.

8

over 40 invoices that aggregated $9,177.16. (PX 39B.) The mean payment time increased to 114 days after the invoice, and the median time rose to 119 days. (See id.)

Although there was no evidence of any unusual collection efforts, there was a significant disparity between the average and median payment times during the Pre-Preference and Preference Periods; the average degree of lateness nearly doubled as bankruptcy approached. At trial, the plaintiff conceded that some deviation was acceptable, and suggested that payment made during the Preference Period within 30 days of the pre-preference mean—35 to 95 days after the invoice date—should be tolerated. (Tr. at 95–96.) Certainly, payments made more than 30 days after the Pre-Preference Period mean should not. E.g. Official Plan Comm. v. Expeditors Int'l of Wash., Inc. (In re Gateway Pac. Corp.), 153 F.3d 915, 918 (8th Cir. 1998) (payments not ordinary where paid, on average, 35 days after the invoice date during the pre-preference period and 54 days after the invoice date during the preference period); Official Comm. of Unsecured Creditors v. CRST, Inc (In re CCG 1355, Inc.), 276 B.R. 377, 383–84 (Bankr. D.N.J. 2002) (payments made, on average, 89.50 days after the invoice date during the preference period not ordinary compared to the average of 66.47 days during the parties' four year business relationship and 73.44 days during the last full year of that relationship); CIS II, 214 B.R. at 120 (payments not ordinary where paid, on average 51 days after the due date during the pre-preference period and 80 days after the due date during the preference period).

With the exception of five invoices, MFS paid all of the invoices during the Preference Period 95 days or more after the invoice date and more than 30 days later than

9

the average time of payment during the Pre-Preference Period. Three payments (invoice nos. 721492, 721429, and 721370), aggregating $14.00, were paid 88, 90 and 93 days, respectively, after the invoice date. (PX 39B.) In light of the plaintiff's concession, these payments will be deemed ordinary and not subject to avoidance.

The other two payments (invoice nos. 722341 ($82.50) and 722899 ($6,224.53)) were made just one day after the invoice was issued, (id.), within the "net 30 days" called for by the invoices. These payments raise a different issue: can payments made within the contractually-agreed period ever be nonordinary? The answer is in the affirmative. "Just as payments that are made after the due date may be considered out of the ordinary course, payments may likewise be out of the ordinary course of business if they are early, that is before the due date, and the defendant does not produce evidence that early payment was the norm between the parties prior to the preference period." 5 COLLIER ¶ 504.04[2][ii], at 547-55; accord R. M. Taylor, Inc. v. Employers Ins. of Wausau (In re R. M. Taylor, Inc.), 245 B.R. 629, 637 (Bankr. W.D. Mo. 2000) (payments made by the debtor during the preference period and before they were due were not consistent with their prior practice and were avoidable).

Gramercy cites three cases that it contends support the contrary proposition. In Ferrar v. PRUSA Distrib. Corp. (In re Kiddy Toys, Inc.), 178 B. R. 928 (Bankr. D.P.R. 1994), the bankruptcy court did state that payments made within the time allotted by their contract "best exemplifies normal business relations," id. at 934, but the statement is dicta. The case involved late payments. Trinkoff v. Porters Supply Co., Inc. (In re

10

Daedalean, Inc.), 193 B.R. 204 (Bankr. D. Md. 1996), included a similar statement, id. at 212, but again, the case involved late payments.[5]

Fitzpatrick v. Rockwood Water, Wastewater & Natural Gas Sys. (In re Tenn. Valley Steel Corp.), 201 B.R. 927 (Bankr. E.D. Tenn. 1996), does support Gramercy's position, implying that payments made within the time fixed by the invoice are conclusively presumed to be ordinary. As an example, the bankruptcy court "presumed" that a creditor who historically received payment from the debtor within 15 days of the invoice date will prevail under 11 U.S.C. § 547(c)(2)(B) if the debtor made a payment on the due date, 30 days after the invoice date. See id. at 936.

The result presumed by the Fitzpatrick court may not be warranted in all cases. Just as late payments may be ordinary, early payments may be nonordinary. The answer depends on the parties' historical practice rather than the terms of the contract they historically ignored. Furthermore, Lovett v. St. Johnsbury Trucking, 931 F.2d 494 (8th Cir. 1991), implicitly rejected Gramercy's argument that payment within the contract terms must be deemed ordinary. There, the parties' agreement called for payment within 30 days after shipment, but the debtor paid the creditor, on average, 62 days after the invoice date during the pre-preference period. Id. at 495–96. During the preference period, the debtor paid, on average, 52 days after the invoice. Id. at 498. The bankruptcy

---

[5] The Daedalean court cited Fred Hawes, 957 F.2d at 244, to support the statement that payments made within the time allotted by the invoice is deemed within the ordinary course of business. The cited reference does not support the proposition. Instead, Fred Hawes, which dealt with late payments, said that the "[f]ailure to make a payment within the time limit set forth in the contract is presumptively 'nonordinary.'" Id.

11

court concluded that the creditor had failed to sustain its burden under § 547(c)(2)(B), because, inter alia, the agreement called for payment within 30 days. Id. at 496.

Following the affirmance by the district court, the Eighth Circuit Court of Appeals reversed. In so doing, it dismissed the notion that given the history of late payments, a payment within the contract terms during the preference period would have immunized the transfer from avoidance:

> The bankruptcy court's reliance on the provision in the agreement that payment would be made within 30 days was misplaced, and provides no support for that court's conclusion that the payments were not made in the ordinary course of business. Indeed, if all the payments within the 90-day period had been made within 30 days of delivery, presumably the bankruptcy court would have held that they were made in the ordinary course of business, even though such payments would have been a drastic departure from the previous practice and presumably would have preferred St. Johnsbury over the other creditors.

Id. at 497 (emphasis added).

In the present case, MFS historically paid late, and the evidence indicates only one instance during the Pre-Preference Period when MFS paid at or near the date that the invoice was issued—the last payment in the sum of $1,462.05 on August 3, 2006. (PX 39A, at 6.) Thus, payments made on or near the invoice date during the Preference Period deviated drastically from the parties' historical practice. Hence, they were not made in the ordinary course of business.[6]

---

[6] Gramercy had also asserted the affirmative defense that at least some of the Debtors' payments constituted contemporaneous exchanges for new value under § 547(c)(1), which states:

(c) The trustee may not avoid under this section a transfer –
(1) to the extent that such transfer was -
  (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

In conclusion, and subject to a credit for the "new value" defense, the plaintiff is entitled to a judgment avoiding payments by MFS to Gramercy under 11 U.S.C. § 547(b) in the sum of $9,163.16.

**C.     FLI**

The history of dealings between Gramercy and FLI was more varied. During the Pre-Preference Period, FLI sent Gramercy 16 checks aggregating $636,848.20.[7] The payments, on average, were made slightly less than 64 days after the invoice date, with a median time of payment of 60 days. (See PX 39C.) The pace of the payments accelerated immediately prior to the beginning of the Preference Period. FLI made four payments on August 3rd (two checks), August 8th and August 15th. (Id. at 29–30.) The four payments aggregated $151,009.57, or 24% of all of the payments made during the entire one year Pre-Preference Period. More importantly, the average payment time was only 13 days after the invoice, more than 50 days earlier than the overall average. (See id.)

The accelerated rate and timing of the payments continued briefly into the Preference Period. In September 2006, FLI sent ten separate payments aggregating $84,033.38, or approximately 89% of the total preference payments. (See PX 39D, at 1.) On average, FLI paid these invoices within ten days, with a median payment time of

---

    (B) in fact a substantially contemporaneous exchange.

    Gramercy apparently abandoned the defense at the conclusion of the trial, (Tr. at 137), and the Court dismissed it. (Id.)

[7]    One of the checks, dated November 28, 2005, was for only $4.00. (PX 39C, at 11.)

seven days, again well within the "net 30 days" called for by the invoices. These included the two COD transactions that FLI paid 12 and 24 days after the invoice.

The flurry of payments slowed as FLI slid into bankruptcy. After September, FLI made just three more payments to Gramercy (October 16th, October 20th and November 1st) aggregating $10,631.00.[8] The average and median payment times for these three payments jumped to 207 days and 215 days, respectively.

### 1. The COD Transactions

As just noted, FLI and Gramercy engaged in two COD transactions during the Preference Period. The COD transactions involved special orders that Gramercy had placed with overseas suppliers. (Tr. at 28, 47.) Because Gramercy would have to pay the supplier, it advised "Simon," the FLI employee responsible for the specially-ordered goods, that FLI would have to pay for these items when they were delivered to FLI. (Tr. at 52.) Simon agreed, (see Tr. at 53), and Gramercy would not have ordered the goods unless Simon first agreed to the COD arrangement. (Tr. at 53–54.) Although Gramercy billed FLI using its form invoice that included the "net 30 day" terms, the parties understood that payment was due at the time of delivery. (See Tr. at 52–53.)

Despite FLI's agreement to the COD arrangement, it did not pay either invoice at the time of delivery. The first COD invoice (No. 722715), in the sum of $13,664.75, was issued on September 5, 2006, (PX 28), the same day the goods were delivered to FLI.

---

[8] The evidence revealed a minor discrepancy regarding the amount of FLI's payments during the Preference Period. The parties stipulated to $94,654.36 in the Joint Pre-Trial Order, but PX 39D indicated that the payments aggregated $94,664.38. The Court has used the lower number in computing the judgment.

14

(Tr. at 59.) FLI paid the invoice on September 29, 2006, 24 days later. (See PX 39D, at 1.) The second COD invoice (No. 722806) in the sum of $34,088.70 was issued on September 8, 2006. (PX 22.) The goods were hand-delivered to FLI on that day. (Tr. at 57.) FLI paid the invoice on September 20, 2006, 12 days later. (Tr. at 57; see PX 21; PX 39D, at 1.)

Gramercy's assertion of the ordinary course of business defense with respect to a COD transaction is problematic. If the parties simultaneously exchanged consideration, there would not be any antecedent debt. If payment was delayed but still substantially contemporaneous, the payment would presumably satisfy the requirements for a contemporaneous exchange for value under § 547(c)(1). Section 547(c)(2), on the other hand, was intended to apply to credit transactions, which COD transactions are not. In essence, Gramercy's assertion of the ordinary course defense regarding the COD transactions is the product of its inability to prove its contemporaneous exchange for value defense.

In any event, no evidence was offered at trial that FLI and Gramercy (or MFS and Gramercy) had ever engaged in a COD transaction before (or after) these two. As "first time" transactions, there was no baseline of dealings to which they could be compared. The cases have reached different conclusions as to whether a "first time" transaction can qualify as an ordinary course transaction under § 547(c)(2). See Enron Creditors Recovery Corp., 376 B.R. at 459–61 (collecting cases). Those courts that recognize that they can look to whether the transaction was one that the debtor would ordinarily enter into, Gosch v. Burns (In re Finn), 909 F.2d 903, 908 (6th Cir. 1990); Compton v. Plain

15

Mktg., LP (In re Tri-Union Dev. Corp.), 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006) Meeks v. Harrah's Tunica Corp. (In re Armstrong), 231 B.R. 723, 731 (Bankr. E.D. Ark. 1999), whether the "first time" debt is "ordinary in relation to this debtor's and this creditor's past practices when dealing with other, similarly situated parties," Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys.), 482 F.3d 1118, 1126 (9th Cir. 2007); or whether the transfers were made in accordance with the terms agreed to by the parties. Kleven, 334 F.3d at 643; Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales), 220 B.R. 1005, 1021 (B.A.P. 10th Cir. Okla. 1998); see 5 COLLIER ¶ 504.04[2][ii], at 547–54 ("If the conduct of the parties to the first time transaction do not vary from the terms of their written agreement, some courts have indicated that the terms of that written agreement will define 'ordinary course of business' for that transaction.")

Although FLI bought jewelry from Gramercy and presumably others, there was no evidence that FLI (or MFS) ever bought merchandise COD on other occasions from Gramercy or any other supplier. Furthermore, there was no evidence that Gramercy ordinarily entered into COD transactions with other customers. Finally, FLI failed to pay on delivery for the merchandise as required by the parties' agreement.[9] In light of the evidence, the Court concludes that Gramercy failed to sustain its defense under § 547(c)(2) with respect to the COD transactions.

---

[9] The evidence at trial also showed that Gramercy had engaged in an unusual collection practice to induce FLI to pay the first COD invoice (PX 28). The merchandise was delivered on September 5, 2006. When payment was not forthcoming, Gramercy faxed the invoice to FLI on September 25, 2006. (Tr. at 67; see PX 28.) There was no evidence that Gramercy ever faxed an invoice to expedite payment on any other occasion.

16

### 2. The Remaining Transactions

Historically, FLI sent, on average, one check each month. It did not send a check every month (<u>e.g.</u>, September 2005, January 2006, July 2006), but sent two checks in June 2006 and three in December 2005.[10] (PX 39C.) As discussed, the pace quickened toward the end of the Pre-Preference Period when FLI sent four checks aggregating 24% of the total Pre-Preference Period payments. FLI made these payments, on average, within approximately two weeks of the invoice date, or 40 days earlier than the Pre-Preference Period mean.

This practice continued into September 2006. FLI made ten payments aggregating $84,033.38, or approximately 89% of the total preference payments.[11] FLI made only three more payments after September: on October 16, 2006, October 20, 2006 and November 1, 2006. (PX 39D, at 1–3.) Despite the fact that FLI paid so often so promptly and so much during September 2006 (which included the two COD transactions), the mean and median payment times during the entire Preference Period were 153.7 and 213 days, respectively.

Only three invoices aggregating $833.35 were paid within 30 days of the baseline average, and are not avoidable.[12] The rest of the invoices were paid either more than 30

---

[10] During the Pre-Preference Period, and prior to August 2006, FLI sent checks dated August 25, 2005, October 21, 2005, November 28, 2005 (in the amount of $4.00), December 12, 2005, December 21, 2005, December 27, 2005, February 8, 2006, March 29, 2006, April 25, 2006, May 1, 2006, June 7, 2006 and June 14, 2006. (PX 39C.)

[11] During September 2006, FLI made payments on the 6th, 11th, 12th, 14th, 15th, 19th, 20th, 22nd, 28th and 29th. (PX 39D, at 1.)

[12] The three invoices were no. 722168, paid on September 14, 2006, (PX39D, at 1), and nos. 722317 and 722960, both paid on October 20, 2006. (<u>Id.</u> at 2.)

17

days earlier (in the case of the remaining September 2006 payments) or more than 30 days later (in the case of all of the other invoices). Furthermore, for the reasons stated previously, the September payments that were made within the "net 30 day" terms were nonetheless nonordinary, a conclusion bolstered by the fact that FLI sent ten checks during a span of time when it rarely sent more than one. Hence, with the exception of the aforementioned $833.35, all of the transfers made by FLI to Gramercy during the Preference Period, aggregating $93,821.01, are subject to avoidance.

To recapitulate, payments by the Debtors aggregating $102,984.17 are avoidable as preferences, but Gramercy is entitled to a credit in the sum of $2,187 under the "new value" exception. Accordingly, the Debtors are entitled to an aggregate judgment under 11 U.S.C. § 550 in the sum of $100,797.17, and in light of the Debtors' de facto substantive consolidation, the plaintiff is directed to submit a single judgment for the entire amount. The foregoing constitutes the Court's findings of fact and conclusions of law.

Dated: New York, New York
       November 4, 2010

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge